**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER MICHAELS, M.D., | Civil Action No. 15-7603 (JLL) |
| Plaintiff, | |
| v. | **OPINION** |
| RUTGERS UNIVERSITY NEW JERSEY MEDICAL SCHOOL, *et al.*, | |
| Defendants. | |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Defendants Rutgers University New Jersey Medical School ("Rutgers") and Barry Levin, M.D.'s motion for summary judgment or, in the alternative, to strike Plaintiff Jennifer Michaels, M.D.'s claim for punitive damages, pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (ECF No. 83). Plaintiff has filed opposition, (ECF No. 96), and Defendants have replied thereto, (ECF No. 102). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants Defendants' motion to the extent that it seeks judgment on Plaintiff's claim for retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 ("FMLA"), but denies Defendants' motion as to all other claims.

# I.  BACKGROUND[1]

## A.  Uncontested Facts

On September 11, 1987, Plaintiff began working as an Assistant Professor for Defendant Rutgers.  (Defs.' SMF ¶ 8).  From 2011 through 2014, the period relevant to this litigation, Plaintiff was a non-tenured Assistant Professor in Defendant Rutgers' Neurology Department.  (Defs.' SMF ¶ 10).  Plaintiff's status as non-tenured meant that she could be reappointed for terms of one to five years.  (Defs.' SMF ¶ 10).  Plaintiff's responsibilities included: (1) "on service" rounds which consisted of patient consults; (2) "grand rounds" which entailed clinical conferences; (3) teaching seminar courses; and (4) co-chairing the Muscular Dystrophy Association Clinic ("MDAC") with Dr. John Bach.  (Defs.' SMF ¶¶ 24–29).

In June 2011, Defendant Levin was appointed Interim Chair of the Neurology Department. (Defs.' SMF ¶¶ 17–18).  Upon his appointment, Defendant Levin met with each member of the Neurology Department in order to discuss workload and maximize efficiency.  (Defs.' SMF ¶ 20). Productivity was measured by a physician's teaching, research, and Relative Value Units ("RVU"), which is a statistical measure of the value of services rendered to patients.  (Defs.' SMF ¶ 22).

## B.  Defendants' Version of Events

### 1.  Plaintiff's Initial Performance Review

During his first few meetings with Plaintiff, Defendant Levin set goals for Plaintiff, which included increasing clinic productivity and patient registration.  (Defs.' SMF ¶ 21).  According to Defendants, Plaintiff's work for the MDAC predominantly involved patient visits "as opposed to

---

[1] This background is taken from the parties' statements of material facts, pursuant to Local Civil Rule 56.1.  (ECF No. 83-2, Defendants' Statement of Material Facts ("Defs.' SMF"); ECF No. 96-1, Plaintiff's Response to Defendants' Statement of Material Facts; ECF No. 96-2, Plaintiff's Statement of Supplemental Facts ("Pl.'s SMF"); ECF No. 102-2, Defendants' Reply to Plaintiff's Statement of Supplemental Facts).

achieving academic responsibilities" for Defendant Rutgers and yielded a relatively low RVU score. (Defs.' SMF ¶¶ 29–31, 33–35). This clinical work, in combination with Plaintiff's teaching and "rounds" responsibilities, was allegedly insufficient to meet the Neurology Department's productivity standards. (Defs.' SMF ¶¶ 24–27, 35–37). Despite Plaintiff's promises, Defendants claim that Plaintiff failed to increase patient visits in the MDAC. (Defs.' SMF ¶ 37).

2. Plaintiff's Assigned Clinical Work

In or around the Spring of 2012, Defendant Levin assigned Plaintiff to the Ambulatory Care Clinic ("ACC"), supposedly to provide Plaintiff with an opportunity to increase her RVU and "fulfill the Neurology Department's fiscal responsibility." (Defs.' SMF ¶ 38). In at least one other circumstance, Defendant Levin allegedly assigned other physicians who were younger to the ACC to give them the opportunity to raise their RVU, (Defs.' SMF ¶¶ 39–40).[2] Defendants claim that Plaintiff struggled to maintain her responsibilities to both the MDAC and ACC, which led Defendant Levin to repeatedly notify Plaintiff of his concerns regarding her productivity levels. (Defs.' SMF ¶¶ 41–48, 50).

In February 2013, a physician emailed Defendant Levin to inform him that Plaintiff's performance in the ACC was deficient, because Plaintiff was too slow with seeing patients. (Defs.' SMF ¶ 53). According to Defendants, medical residents and students also complained that working with Plaintiff negatively affected their learning experience and ability to see all of their patients. (Defs.' SMF ¶¶ 55–56). Supposedly as a result of these complaints, Defendant Levin informed Plaintiff that: (i) clinic staff would schedule her appointments at a rate of one hour for new patients and thirty minutes for follow-up patients; and (ii) she would no longer have the assistance of medical residents or students. (Defs.' SMF ¶¶ 54, 56). Despite these complaints,

---

[2] It is worth noting, and shall be relevant later on, that all of these physicians mentioned by Defendants are women. (*See* Defs.' SMF ¶¶ 12, 40).

however, Defendants concede that Plaintiff increased her RVU score through her work with the ACC. (Defs.' SMF ¶ 58).

3. Plaintiff's Vacation & FMLA Leave Request

On May 20, 2013, Plaintiff submitted several vacation requests for June and July of 2013, which included five days that Plaintiff was scheduled to work in the ACC. (Defs.' SMF ¶¶ 59–60). According to Defendants, Defendant Levin denied Plaintiff's request, as many of the requested days overlapped with her ACC responsibilities, and he had his assistant inform Plaintiff of his decision. (Defs.' SMF ¶¶ 61–62). Plaintiff allegedly failed to recognize the statement of Defendant Levin's assistant as having any authority and was nevertheless absent from work on the requested vacation days. (Defs.' SMF ¶¶ 62–63). Upon learning that Plaintiff had taken off on her requested vacation days and that she had only attended one clinic day in June 2013, Defendant Levin sent Plaintiff a formal letter of reprimand in July 2013, which was forwarded to the Vice Dean of Defendant Rutgers. (Defs.' SMF ¶¶ 65, 67). A few days later, Defendant Levin addressed all of the clinical faculty regarding "the importance of attending scheduled ACC[s]." (Defs.' SMF ¶ 68).

As discussed in more detail below, *infra* Section I.B.3, it is uncontested that Plaintiff then requested FMLA leave, which was approved by Defendant Levin.

4. Plaintiff's Subsequent Performance Review & Termination

On September 11, 2013, Plaintiff received her performance evaluation from Defendant Levin for the period of July 2012 through June 2013. (Defs.' SMF ¶ 92). At the evaluation, Defendant Levin recognized Plaintiff's talent as "possibly the best neuromuscular physician in the state of New Jersey," but further stated that she: (i) provided deficient service to the Neurology Department; (ii) did minimal training; and (iii) "had a limited scholarly role." (Defs.' SMF ¶ 93).

In reaching this conclusion, Defendant Levin employed a separate measurement which looked at Plaintiff's patient encounters and overall productivity. (Defs.' SMF ¶¶ 94–98). Defendant Levine allegedly utilized this unique measurement to grade Plaintiff's performance because he wanted to determine "what was fair to ask [Plaintiff] to do." (Defs.' SMF ¶¶ 94–98). Defendant Levin stressed to Plaintiff that her performance was "well below acceptable levels" and must be improved over the following year. (Defs.' SMF ¶ 99). Defendant Levin also gave Plaintiff specific goals to meet by the beginning of 2014, which included seeing a minimum of five patients per four hours during her weekly ACC duties. (Defs.' SMF ¶ 101).

In October 2013, Plaintiff, through counsel, sent a letter to the Dean of Defendant Rutgers, alleging that she has been discriminated against based on her gender and age. (Defs.' SMF ¶¶ 104–06). The letter was referred to Defendant Rutgers' Office of Employment Equity ("OEE"), which then attempted to contact Plaintiff in order to investigate her claims. (Defs.' SMF ¶¶ 107–09). According to Defendants, Plaintiff failed to schedule a mandatory interview with the OEE, and therefore no further action was taken on her complaints. (Defs.' SMF ¶¶ 109–11).

During the months following Plaintiff's evaluations, Defendants allege that she did not improve her performance and continued to take an allegedly excessive amount of time with each clinic patient. (Defs.' SMF ¶¶ 119–21). When Plaintiff's continued appointment was being considered in early 2014, Defendant Levin recommended to the Clinical Integration Group of Defendant Rutgers—*i.e.*, the board that determines faculty appointments—that Plaintiff's contract not be renewed. (Defs.' SMF ¶¶ 124–25). On February 26, 2014, Plaintiff was notified by way of a letter from the Dean of Defendant Rutgers that her appointment would not be renewed and that her position would expire on June 30, 2014. (Defs.' SMF ¶¶ 122–29).

## C. Plaintiff's Version of Events

### 1. Plaintiff's Performance & Defendant Levin's Conduct

According to Plaintiff, Defendant Levin's productivity critiques were false and disparate. Specifically, Plaintiff claims that, contrary to Defendants' allegations, she increased her productivity each time it was requested by Defendant Levin, which was evidenced by: (i) a 33% increase in her RVU productivity score from 2011 to 2013; (ii) continued work with the MDAC and teaching seminar courses; (iii) an increase in patient visits of around 45% since 2009; (iv) possessing the fifth highest RVU score in 2013 out of the Neurology Department's twelve physicians; (v) "working 12-hour days [in 2013], [with] five months on inpatient service in addition to her outpatient responsibilities"; and (vi) emails from other doctors sent to Defendant Levin praising Plaintiff's work. (Pl.'s SMF ¶¶ 32–33, 88, 146–51, 221).

In response to these improvements, Defendant Levin allegedly added new and challenging responsibilities to Plaintiff's schedule in an attempt to move "the goal post" further away from her. (Pl.'s SMF ¶¶ 71–74). For example, after Plaintiff raised her RVU score, Defendant Levin allegedly required her to obtain a 20% increase in her productivity score by the following year, i.e., 2014. (Pl.'s SMF ¶ 91). One physician, Dr. Hajart, admitted that such an increased requirement to Plaintiff's RVU score "seemed arbitrary." (Pl.'s SMF ¶ 92). Plaintiff further claims that Defendant Levin used the tallying of patient encounters to measure Plaintiff's productivity in addition to her RVU score, which was not used to measure the productivity of any other physician in the Neurology Department. (Pl.'s SMF ¶¶ 91, 93, 96–99, 178). Plaintiff claims that Defendant Levin used these inaccurate critiques and ever-changing requirements as an excuse to berate and yell at Plaintiff. (See Pl.'s SMF ¶¶ 25, 79, 130, 162, 164, 180). Plaintiff further claims that Defendant Levin used Plaintiff's allegedly fabricated underperformance as a pretext to

revoke several of her privileges, including her abilities to teach and use a research assistant. (Pl.'s SMF ¶¶ 63–67).

Moreover, Defendant Levin supposedly minimized Plaintiff's contributions to the department in his communications with other physicians. For example, Defendant Levin allegedly falsely claimed that Plaintiff increased her RVU score by having "no other responsibilities," and that Plaintiff should be able to raise her RVU score even higher. (Pl.'s SMF ¶¶ 90–91). Additionally, Defendant Levin allegedly undermined Plaintiff's clinical work by saying that the amount of time she spent with patients was "inordinate." (Pl.'s SMF ¶¶ 176–77). According to Plaintiff, Defendant Levin also spoke poorly of Plaintiff in his emails to other physicians—for example, he forwarded Plaintiff's request for leave to another physician with the statement "Here we (I) go again," and told a different physician that he deserved "a purple heart" for sitting in on Plaintiff's performance review. (Pl.'s SMF ¶¶ 183, 214). As time went on, and Defendant Levin allegedly became more hostile towards her, Plaintiff claims she experienced anxiety whenever she was contacted by Defendant Levin. (Pl.'s SMF ¶¶ 79, 87).

According to Plaintiff, Defendant Levin was far more lenient to Plaintiff's younger male colleagues, despite the fact that they committed worse offenses and had lower RVU scores than Plaintiff. (Pl.'s SMF ¶¶ 174, 178). For example, Dr. Souayah, a male doctor twenty years younger than Plaintiff, was never reprimanded or otherwise punished by Defendant Levin despite the fact that he allegedly: (i) overbilled; (ii) was audited by Medicare and forced to refund money; and (iii) was at one point described by Defendant Levin as "the 'wor[st] offender.'" (Pl.'s SMF ¶ 310). Additionally, Plaintiff claims that only women were required to take clinical positions outside of their area of specialty, such as Plaintiff being assigned to the ACC. (Pl.'s SMF ¶ 62).

2. <u>Plaintiff's Vacation Request & Letter to Defendant Levin</u>

In or around May 2013, Defendant Levin allegedly refused to approve or deny Plaintiff's "use it or lose it" vacation time until after the requested dates had passed. (Pl.'s SMF ¶¶ 101–06). Plaintiff supposedly misunderstood Defendant Levin's lack of a response as permission to take vacation, and was sent a formal letter of reprimand by Defendant Levin after taking said vacation time. (Pl.'s SMF ¶¶ 107–113). This was the only reprimand letter that Plaintiff received in the twenty-seven years that she worked at Defendant Rutgers. (Pl.'s SMF ¶ 132).

After Defendant Levin sent the formal letter of reprimand, and after enduring Defendant Levin's alleged hostility towards her, Plaintiff sent a rebuttal letter in July 2013 which described the "harassment and hostile work environment that she had been subjected to"—including "his 'systematic berating of the past year' which left her 'demeaned and demoralized'"—and responded to several of Defendant Levin's complaints of insubordination. (Pl.'s SMF ¶¶ 117–130). Plaintiff claims that she put Defendant Rutgers on notice of her alleged hostile work environment by copying the Vice Dean and the Chief of Service of Defendant Rutgers on her letter to Defendant Levin. (Pl.'s SMF ¶¶ 117, 133). The Associate Dean of Faculty Affairs confirmed receipt of Plaintiff's letter and stated that same would be placed in Plaintiff's personnel file. (Pl.'s SMF ¶ 136).

Plaintiff claims that Defendant Rutgers was further put on notice of the alleged hostile work environment by Defendant Levin's email to the Vice Dean three weeks after she sent her July 2013 letter, in which Defendant Levin explained that Plaintiff was "telling everyone" that she was subjected to "a 'hostile work environment.'" (Pl.'s SMF ¶¶ 137–39). Defendant Levin asked the Vice Dean "what protections he would have" if Plaintiff brought an action against him, which he believed there was "a reasonable chance" that she would. (Pl.'s SMF ¶¶ 139–40). The Vice

Dean forwarded Defendant Levin's email to the counsel for Defendant Rutgers. (Pl.'s SMF ¶¶ 142–43).

Despite allegedly being put on notice by the July 2013 letter and Defendant Levin's subsequent email, neither the Vice Dean nor any other employee of Defendant Rutgers at that time: (i) investigated Plaintiff's complaints; (ii) contacted Plaintiff about her concerns; or (iii) forwarded said complaints to the OEE. (Pl.'s SMF ¶¶ 136, 142, 144, 207). According to Plaintiff, the failure of the employees of Defendant Rutgers to forward Plaintiff's complaint to the OEE was in direct violation of Defendant Rutgers' policy, which states, "[i]f managers and supervisors receive reports of discrimination or harassment, they are required to refer them immediately to the [OEE]," regardless of whether the report was provided by the victim or someone else. (Pl.'s SMF ¶¶ 142–143). After Plaintiff sent this letter in July 2013 informing Defendant Rutgers about Defendant Levin's allegedly inappropriate and hostile behavior, Defendant Levin told Plaintiff that she was required to obtain a 30% increase in her productivity score by 2014. (Pl.'s SMF ¶¶ 180–81). This requirement was 10% higher than Defendant Levin's stated productivity goal for Plaintiff prior to her sending the July 2013 letter. (Pl.'s SMF ¶¶ 180–81).

### 3. Plaintiff's FMLA Leave Request

On or around October 29, 2013, Plaintiff made a written request to Defendant Levin for leave under the FMLA in order to care for her daughter who was undergoing major surgery. (Pl.'s SMF ¶ 213). Specifically, Plaintiff requested two weeks of FMLA leave beginning on November 25, 2013 followed by a twelve-week period of intermittent leave beginning on December 9, 2013. (Pl.'s SMF ¶ 215). During the period of intermittent leave, Plaintiff would work two days a week "plus night and weekend coverage of the Neurology Department." (Pl.'s SMF ¶ 215). Plaintiff also suggested that her ACC patients be transferred to the MDAC for more efficient treatment

while she was on intermittent leave. (Pl.'s SMF ¶ 216). On or around October 30, 2013, Plaintiff met with Defendant Levin to discuss her requested FMLA leave. (Pl.'s SMF ¶ 217). Defendant Levin allegedly screamed at Plaintiff and stated that he would require her to make up the work that she missed during her FMLA leave if he was legally able to. (Pl.'s SMF ¶¶ 219–20, 223).

The following day, Defendant Levin inquired to the Dean of Faculty Affairs as to whether he could compel Plaintiff to make up the work she would miss while on FMLA leave, and he was informed that he could not do so. (Pl.'s SMF ¶¶ 233–36). Defendant Levin then inquired as to whether he could move Plaintiff's scheduled rotations until after she returned from FMLA leave, which he was again told was not permitted. (Pl.'s SMF ¶¶ 237–40). That same day, Defendant Levin approved her FMLA requests, but denied her suggestion to transfer the ACC patients to the MDAC and instead required Plaintiff to spend a half-day per week on a day of her choosing at the ACC. (Pl.'s SMF ¶¶ 224–27).

4. Plaintiff's Termination

On January 2, 2014, while Plaintiff was on intermittent FMLA leave, Defendant Levin contacted the Vice Dean about issuing a non-renewal letter for Plaintiff's appointment. (Pl.'s SMF ¶ 253). On January 21, 2014, following Defendant Levin's recommendation, the Clinical Integration Group chose not to reappoint Plaintiff. (Pl.'s SMF ¶¶ 254–58). As stated above, Plaintiff was informed on February 26, 2014 that her appointment had not been renewed and that her employment would terminate effective June 30, 2014. (Pl.'s SMF ¶ 275). At the time of Plaintiff's termination, she was sixty-six years old and the oldest full-time clinician of the Neurology Department. (Pl.'s SMF ¶¶ 20, 317). Upon Plaintiff's departure, Dr. Souayah, a male doctor who was twenty years younger than Plaintiff and described by Defendant Levin as "the

'wor[st] offender,'" was chosen by Defendant Levin to replace Plaintiff as Co-Chair of the MDAC. (Pl.'s SMF ¶¶ 310, 315).

**D. Procedural History**

Accordingly, Plaintiff brought this action on October 20, 2015 against Defendants, seeking among other things compensatory and punitive damages for the discrimination and retaliation she was allegedly subjected to by Defendants on the basis of her sex, age, and request for FMLA leave. (*See generally* ECF No. 1 ("Compl.")). Specifically, Plaintiff alleges the following causes of action against Defendant Rutgers only: (i) Retaliation in Violation of the FMLA ("Count One"); (ii) Sex Based Discrimination in Violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") ("Count Two"); (iii) Retaliation in Violation of Title VII ("Count Three"); (iv) Age Based Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") ("Count Four"); and (v) Retaliation in Violation of ADEA ("Count Five"). (Compl. ¶¶ 166–214). Additionally, Plaintiff alleges the following causes of action against both Defendant Rutgers and Defendant Levine, individually: (vi) Sex Based Discrimination in Violation of the New Jersey Law Against Discrimination, N.J.S.A. 1:05–1 *et seq.* ("NJLAD") ("Count Six"); (vii) Age Based Discrimination in Violation of NJLAD ("Count Seven"); and (viii) Retaliation in Violation of NJLAD ("Count Eight"). (Compl. ¶¶ 215–45). Defendants now move for summary judgment.

## II.  LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists "no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he moving party must show that the non-moving party has failed to

establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.   ANALYSIS

### A. Burden Shifting Framework

In determining this motion for summary judgment, the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) ("the *McDonnell Douglas* test"), applies to each of Plaintiff's statutory claims. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (applying the *McDonnell Douglas* test to a FMLA retaliation claim); *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008) ("Discrimination claims brought under Title VII and NJLAD must be analyzed according to [the *McDonnell Douglas* test]"); *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (applying the *McDonnell Douglas* test to a retaliation claim under Title VII); *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir. 2004) (applying the *McDonnell Douglas* test to an ADEA claim).

Under the *McDonnell Douglas* test, a plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802;

*see also Moore*, 461 F.3d at 342 (applying the *McDonnell Douglas* test to a retaliation claim). If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to articulate such a reason, the plaintiff must then show that the proffered reason was a pretext for a discriminatory decision in order to survive summary judgment. *Id.* at 804–05.

Here, Defendants argue that Plaintiff has not established a *prima facie* claim for any of the Counts in her Complaint and cannot rebut Defendants' legitimate reason for terminating her employment based on the quality of her performance. (*See generally* ECF No. 83-1). However, when viewing the facts in a light most favorable to her, Plaintiff has raised material issues of fact regarding her treatment and termination by Defendants in order for her claims, with the exception of Count One, to survive summary judgment under the *McDonnell Douglas* test.

**B. Step 1: Plaintiff's Burden to Establish a *Prima Facie* Claim**

1. FMLA Retaliation

To establish a *prima facie* claim for retaliation in violation of the FMLA, Plaintiff must show that: (i) she exercised her FMLA rights; (ii) she was subjected to an adverse employment action; and (iii) there was a causal connection between the exercise of her FMLA rights and the adverse employment action. *See Hayduk v. City of Johnstown,* 386 F. App'x 55, 60 (3d Cir. 2010). "To demonstrate a causal connection [for a FMLA retaliation claim], a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Here, Plaintiff cannot establish a *prima facie* case for FMLA retaliation because there is no causal link between her request for FMLA and any adverse employment actions. Defendant Levin's alleged hostile and disparate conduct of Plaintiff occurred both before and after Plaintiff requested FMLA leave, and are therefore not necessarily connected to the FMLA claim. *See Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791, 799 (11th Cir. 2000) ("[T]he plaintiff must generally show that the decision maker was aware of the protected conduct *at the time of the adverse employment action.*") (emphasis added); *Lichtenstein,* 691 F.3d at 308 (quoting the language from *Brungart*). Furthermore, the decision to terminate Plaintiff occurred at the earliest in January 2014—*i.e.,* three months after Plaintiff requested FMLA leave—which leads the Court to conclude that the temporal proximity between Defendants' conduct and Plaintiff's request was not "unusually suggestive" to support an inference of causation. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 233 (3d Cir. 2007) (stating that, in order for a temporal proximity to be unusually suggestive for a retaliation claim, "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *see also C.M. v. Bd. of Educ.,* 128 F. App'x 876, 883 (3d Cir. 2005) (explaining that a gap of three months between the protected activity and adverse employment action did not support an inference of causation).

Despite the absence of an unusually suggestive temporal proximity, Plaintiff nevertheless argues that the record evidences a pattern of antagonism. Specifically, Plaintiff argues that a pattern of antagonism can be found because, months before the non-renewal of her appointment, Defendant Levin told Plaintiff that he would require her to make up any work she missed while on FMLA leave if he was legally able to do so. (ECF No. 96 at 4). Plaintiff also points to the fact that Defendant Levin asked several employees of Defendant Rutgers whether he would be

permitted to compel Plaintiff to make up work she missed on FMLA leave, despite repeatedly being told he could not. (*Id.*). Additionally, Plaintiff claims that one of the reasons her faculty appointment was not renewed was because of her "missed clinic days" and it should be left to the jury to decide whether any of those missed clinic days overlapped with her FMLA leave. (*Id.* at 4–5).

While, as discussed in the following sections, Plaintiff has certainly proffered evidence of a pattern of antagonism related to her other claims of discrimination and retaliation, the record does not indicate a pattern of antagonism in connection with Plaintiff's request for FMLA leave. First, the Court agrees with Defendants that Defendant Levin's inquiry into whether he could require Plaintiff to make up work she missed while on FMLA leave does not show a pattern of antagonism, considering it is uncontested that Defendant Levin nevertheless granted her request for FLMA leave and did not require Plaintiff to make up the missed work. Second, it is uncontested that Defendant Levin rearranged Plaintiff's responsibilities in order for her to fulfill her ACC requirements on the days she was scheduled to be at work. (*See* Defs.' SMF ¶¶ 116–18; ECF No. 96-1 ¶¶ 116–18). This fact undermines Plaintiff's argument that her missed clinic days, as referenced by Defendants in their decision to terminate Plaintiff's employment, overlapped with her FMLA leave. Accordingly, a reasonable fact finder could not conclude that there was a causal link between Plaintiff's termination and her request for FMLA leave. Accordingly, Plaintiff cannot establish a *prima facie* claim for Count One, and Defendants are entitled to summary judgment on same.

2. <u>Sex Based Discrimination</u>

A *prima facie* case for sex based discrimination under Title VII and NJLAD "requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position;

(3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). An adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

In this case, there is no argument that Plaintiff is a female and therefore under a protected class. Plaintiff has also presented facts showing she was qualified to hold her position, as she alleged that she met Defendants' ever-changing productivity requirements by increasing her productivity score by 33% and having the fifth highest RVU score out of the twelve physicians in the Neurology Department. (Pl.'s SMF ¶¶ 88, 174). Further evidence that Plaintiff was qualified for her position is the uncontested fact that Defendant Levin referred to her as "possibly the best neuromuscular physician in the state of New Jersey." (Defs.' SMF ¶ 93).[3] As for the third element, Plaintiff alleges several significant changes to the "terms, conditions, and privileges of [her] employment," including but not limited to the revocation of her abilities to teach and use a research assistant, as well as her termination. *See Burlington Indus., Inc.*, 524 U.S. at 751–52 (citations omitted).

Finally, Plaintiff has set forward evidence showing an inference of discrimination. For example, Plaintiff alleged that male colleagues, such as Dr. Souayah, committed far more culpable

---

[3] Though Defendants try to argue that Plaintiff was not qualified based on her unsatisfactory performance, (ECF No. 83-1 at 14), said argument is more relevant to the Court's determination at Steps Two and Three of the *McDonnell Douglas* test and therefore shall be considered below. *See Pizio v. HTMT Global Sols.*, Civil Action No. 09-1136, 2014 WL 2926499, at *4 (D.N.J. June 27, 2014) ("Determining whether or not Plaintiff performed his job satisfactorily is part of the pretext stage of the [*McDonnell Douglas* test].") (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)).

offenses and had lower RVU scores than Plaintiff but were not reprimanded by Defendant Levin and did not lose their privileges or employment. (Pl.'s SMF ¶¶ 174, 178). Plaintiff was allegedly reprimanded more often and graded differently than all of her colleagues, many of whom were younger males with lower productivity scores than Plaintiff. (Pl.'s SMF ¶¶ 96, 171, 174, 178). Finally, under this alleged inference of discrimination, Plaintiff was replaced as Co-Chair of the MDAC by Dr. Souayah, a younger male colleague. (Pl.'s SMF ¶ 310). When viewed in a light most favorable to Plaintiff, these facts are sufficient to establish a *prima facie* claim for sex based discrimination. Therefore, Counts Two and Six survive Step One of the *McDonnell Douglas* test.

### 3. Age Based Discrimination

In order to establish a *prima facie* case of age discrimination under the ADEA or NJLAD, Plaintiff must demonstrate that she: (1) was over forty years old; (2) suffered from an adverse employment decision; (3) was qualified for the position in question; and (4) was ultimately replaced, or that her position was filled, by a younger person "to support an inference of discriminatory animus." *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 974 (3d Cir. 1998). "In order for a plaintiff to satisfy the 'sufficiently younger' standard, we have noted that there is no 'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'" *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999). The burden of establishing a *prima facie* case of disparate treatment is not onerous. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Taylor v. Amcor Flexibles, Inc.*, 507 F. App'x 231, 233 (3d Cir. 2012).

In this case, Plaintiff was over forty years old when, as discussed above, she claims to have suffered adverse employment actions, including the revocation of her privileges and her

termination, despite her qualifications. As for the fourth element, Plaintiff's position as Co-Chair of the MDAC was filled by a male employee who was twenty years younger than her and was allegedly less qualified, thus creating an inference of age discrimination. *See Smith*, 589 F.3d at 689. Accordingly, Plaintiff has established a *prima facie* claim for Counts Four and Seven, and therefore, same survive Step One of the *McDonnell Douglas* test.

4. Retaliation

To make a *prima facie* showing of retaliation under Title VII or NJLAD, Plaintiff must establish that: (1) she participated in a protected activity; (2) her employer took an adverse employment action after or contemporaneous with the protected activity; and (3) there is a causal link between the protected activity and the employer's adverse action. *See Kant v. Seton Hall Univ.*, 289 F. App'x. 564, 567 (3d Cir. 2008) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001)). This same analysis is applicable to Plaintiff's retaliation claims under the ADEA. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995) ("The procedural framework in ADEA retaliation cases also follows that of Title VII.").

For the first element of retaliation, the Third Circuit does "not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct.'" *Id.* at 702. However, a proper communication cannot be "too vague," as the protected activity must either explicitly or implicitly allege that unlawful discrimination was the basis of the unfair conduct. *Id.* With respect to the second element, "a plaintiff claiming retaliation . . . must now show only that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Weiler v. R & T Mech., Inc.*, 255 F. App'x. 665, 668 n.1 (3d Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)); *see*

*also Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). Finally, as stated above, causation can be shown by "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun*, 765 F.3d at 258 (quoting *Lauren W. ex rel. Jean W.*, 480 F.3d at 267). Here, Plaintiff has sufficiently alleged all three elements for retaliation.

### a. *Protected Activity*

Plaintiff claims that she engaged in the protected activity of notifying Defendant Rutgers of the harassment and hostile work environment that she was enduring by way of a July 2013 letter, and that Defendants did not forward this letter to the OEE in violation of Defendant Rutgers' established policy. (ECF No. 96 at 25). Furthermore, Plaintiff claims that she engaged in the additional protected activity of submitting a letter through her Counsel in October 2013 specifically alleging that she was subjected to sex and age based discrimination. (*Id.* at 26).

Defendants argue that Plaintiff did not engage in a protected activity by sending the July 2013 letter, because same did not specifically allege age or sex based discrimination. (ECF No. 83-1 at 28). Though age or sex were not mentioned in the July 2013 letter, it did state that Defendant Levin was intentionally placing Plaintiff in "a vulnerable and tense position" based on his hostile and disparate treatment. (ECF No. 96 at 25). It would appear that this letter to some extent did put Defendants on notice of the discrimination that Plaintiff was being subjected to, considering Defendant Levin emailed the Vice Dean of Defendant Rutgers soon after and explained that Plaintiff was "telling everyone" that Defendant Levin subjected her to a "hostile work environment." (*Id.*). Upon considering both the content and surrounding circumstances of the July 2013 letter, the Court concludes that the question of whether sending said letter amounted to a protected activity should be left for a determination by the jury.

Furthermore, it is uncontested by the parties that the October 2013 letter sent by Plaintiff's Counsel qualified as a protected activity, as it specifically put Defendants on notice of Plaintiff's sex and age based discrimination claims. (ECF No. 83-1 at 27; ECF No. 96 at 26). Based on these findings, the Court concludes that Plaintiff has sufficiently proffered evidence establishing the first element of a *prima facie* claim of retaliation.

    *b.   Remaining Elements*

As for the second element, Plaintiff suffered the adverse employment actions discussed in the previous sections, including the revocation of her privileges and termination, as well as the additional action that her performance goals were consistently changed. *See McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 435 (D.N.J. 2009) ("[I]n the retaliation context, an employment action that is 'materially adverse' is considered more broadly [than in the discrimination context] as one that is 'likely' to 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68). As to the final element, Plaintiff at the very least established a pattern of antagonism as she was subjected to hostility from Defendant Levin which allegedly increased after she attempted to report his behavior. For example, Plaintiff claims that Defendant Levin increased the productivity score she was required to meet by 10% soon after Plaintiff sent the July 2013 letter. (ECF No. 96 at 29). Considering Plaintiff has alleged facts supporting each of the elements of a *prima facie* claim of retaliation, the Court finds that Counts Three, Five, and Eight survive Step One of the *McDonnell Douglas* test.

### C.  Step 2: Defendants' Burden to Show Legitimate Reason for Conduct

Having established a *prima facie* case for Counts Two through Eight, the burden now moves to Defendants to assert a legitimate, non-discriminatory reason for the disparate treatment

and termination of Plaintiff. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). "If the employer [sets] forth a legitimate business explanation, then the presumption of discriminatory intent created by the employee's *prima facie* case is rebutted and the presumption simply drops out of the picture." *Barber*, 68 F.3d at 698 (internal quotations omitted).

Defendants have alleged facts to sufficiently meet this standard. Defendants claim that this case has nothing to do with discrimination or retaliation, but rather pertains to an employee who was justifiably reprimanded and terminated for failing to meet her legitimate and expected productivity levels, despite Defendants' repeated warnings and attempts to assist her. (ECF No. 83-1 at 1). To support this claim, Defendants point to the fact that Defendant Levin met with *all* physicians in the Neurology Department to maximize their productivity scores, and Plaintiff repeatedly failed to meet these goals. (*Id.* at 8). According to Defendants, Plaintiff's failure to timely and adequately complete her clinical work was evidenced by the complaints of multiple physicians and students, the latter of which requested to no longer work with her thereby resulting in Plaintiff losing her access to research assistants. (*Id.* at 9). Apparently in an attempt to assist Plaintiff in meeting her productivity score, Defendant Levin assigned Plaintiff to the ACC. (*Id.*). However, Defendants claim that Plaintiff resented the assignment and intentionally requested vacation time on days that she was assigned to the ACC. (*Id.* at 10). After approximately two years of repeated warnings and assistance from Defendants, Plaintiff was still unable to sufficiently raise her productivity score and was terminated. (*Id.* at 11–12). Upon Plaintiff's termination, Defendants claim that Dr. Souayah was placed in charge of the MDAC, not because he was a man, but rather because he was the only physician who specialized in neuromuscular diseases. (*Id.* at 18). Based on this narrative, which appears to be supported by evidence in the record, the Court

concludes that Defendants have met their burden at Step Two and that the burden is now upon Plaintiff to establish an indication of pretext.

### D. Step 3: Plaintiff's Evidence of Pretext

A plaintiff seeking to avoid summary judgment at the pretext stage must offer sufficient evidence that would "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations and emphasis omitted). To that end, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (quotations omitted); *see also Greenberg v. Camden Cnty. Vocational & Tech. Schs.*, 310 N.J. Super. 189, 200 (App. Div. 1998) (stating same).

Importantly, when determining whether a proffered reason is a pretext, this Court "must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). This Court must also "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* It is up to the jury to weigh the evidence, determine the credibility of testimony, and draw the necessary inferences from each. *Id.* As such, this Court must determine whether Defendants' proffered reason is a pretext by giving "credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence

comes from disinterested witnesses.'" *Id.* at 151 (quoting C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed.1995)).

Here, Plaintiff offers sufficient evidence to cast doubt on whether Defendants' proffered legitimate non-discriminatory reason to terminate her employment was true. First, Plaintiff has set forward evidence contradicting Defendants' performance critiques and showing that she did in fact meet the requirements given by Defendant Levin. For example, Plaintiff raised her RVU score by 33% and had the fifth highest RVU score out of the twelve physicians. (Pl.'s SMF ¶¶ 88, 174). Other physicians advocated on Plaintiff's behalf regarding the quality of her work, but these communications were dismissed by Defendant Levin. For instance, Defendant Levin was angered that another physician advocated on Plaintiff's behalf and stated that said physician's involvement was "[n]ot helping [Plaintiff's] case." (Pl.'s SMF ¶ 147). It appears that at least one of Defendant Levin's associates, Dr. Kamin, did not find this reaction reasonable, considering Dr. Kamin allegedly explained to Defendant Levin that he could not blame people who wanted to speak highly of Plaintiff. (Pl.'s SMF ¶ 148).

Plaintiff further contradicts Defendants' purportedly legitimate reason by proffering evidence that Defendants changed the goals set for Plaintiff in an attempt to justify her termination. For example, when Defendant Levin was unable to discredit Plaintiff's raised RVU score, he increased her productivity goal by 20% and then by an extra 10% after Plaintiff tried to report Defendant Levin's hostile conduct. (Pl.'s SMF ¶¶ 91, 180–81). One physician, Dr. Hajart, conceded that the 20% increase in Plaintiff's required RVU score seemed arbitrary. (Pl.'s SMF ¶ 92). Defendant Levin also graded Plaintiff differently than all other physicians in the Neurology Department by measuring the number of patients she encountered, and set allegedly arbitrary

requirements on how many patients Plaintiff must see during her time at the ACC. (Pl.'s SMF ¶¶ 71, 96).

Finally, Plaintiff has set forward evidence that this allegedly discriminatory conduct was based on her sex and/or age. Specifically, Plaintiff claims that Defendant Levin did not reprimand her younger male colleagues, many of whom ranked significantly below Plaintiff with regard to productivity scores. For example, Dr. Souayah, who was allegedly not as qualified as Plaintiff but nevertheless replaced her at the MDAC, was supposedly never reprimanded by Dr. Levin. (Pl.'s SMF ¶ 310). Additionally, Plaintiff alleges that only women employees were reprimanded by Defendant Levin and/or assigned to clinics outside their specialty area, such as Plaintiff working in the ACC. (Pl.'s SMF ¶¶ 62, 79). All of these facts, together with Plaintiff's *prima facie* evidence, raise a material issue as to whether Defendants' proffered reason was a pretext for discriminatory and/or retaliatory animus, which should be left for a determination by the jury. Accordingly, Defendants' motion for summary judgment as to Counts Two through Eight is denied.

### E. Hostile Work Environment Claim

Though not listed as a specific claim in Plaintiff's Complaint, the parties argue that there is a cause of action for hostile work environment in this case. (*See* 83-1 at 23; ECF No. 96 at 19). To state a claim for hostile work environment, Plaintiff must show that: (1) the employee would not have suffered discrimination but for her sex and/or age; (2) the discrimination suffered was pervasive and regular; (3) the discrimination detrimentally affected employee; (4) a reasonable person of that sex and/or age in that position would have been detrimentally affected; and (5) the employer is liable under the theory of respondeat superior liability. *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 860 (3d Cir.1990); *see also Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d

569, 576 n.10 (D.N.J. 2005) ("[T]he hostile work environment analyses for Title VII and NJLAD claims are 'strikingly similar'. . . ."). As to the final element, "[i]f a harasser is the victim's supervisor, then the employer may be held strictly liable." *Bumbarger v. New Enter. Stone & Lime Co., Inc.*, 170 F. Supp. 3d 801, 837 (W.D. Pa. 2016) (citing *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 107 (3d Cir. 2009)). In the context of a hostile work environment claim, an employee qualifies as a supervisor "only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 432 (2013).

Despite Defendants' arguments, (ECF No. 83-1 at 23), Plaintiff has proffered facts showing a *prima facie* claim of hostile work environment that, to the extent it is alleged in this case, should be left for a determination by the jury. First, as discussed above, Plaintiff has alleged that she was discriminated and retaliated against based on her sex and age, as evidenced by the fact that: (1) her younger male colleagues were not reprimanded by Defendant Levin or subjected to changing productivity requirements despite having lower productivity scores; and (2) women were allegedly treated more severely than men by Defendant Levin. (ECF No. 96 at 20).

In regard to the second element, Plaintiff claims she was subjected to pervasive and regular discrimination based on Defendant Levin's hostile manner, which included Defendant Levin "systemically berat[ing]" and humiliating Plaintiff for approximately two years. (*Id.* at 20–21). As discussed above, Defendant Levin also allegedly altered Plaintiff's required productivity goals in order to undermine her and to justify terminating her employment. As to the detrimental effect

of this conduct, Plaintiff points to her July 2013 letter, in which she specifically states that this hostile work environment has "exploited" her and left her "demeaned and demoralized." (*Id.*).

As to the final element, Plaintiff alleges that Defendant Levin was her supervisor based on his status as Dean of her department, which could potentially make Defendant Rutgers strictly liable. (*Id.* at 21–22). Plaintiff also alleges that Defendant Rutgers was put on notice based on Defendant Levin's email to the Vice Dean explaining that Plaintiff was accusing Defendant Levin of creating a hostile work environment. (*Id.* at 22). Plaintiff further claims that this email was not forwarded to the OEE, allegedly in violation of Defendant Rutgers' policy. (*Id.* at 23–25). These allegations, taken in a light most favorable to Plaintiff, would allow a reasonable fact finder to determine that Plaintiff was subjected to a hostile work environment. Therefore, such a claim survives Defendants' motion for summary judgment to the extent that it is alleged in this case.

## F. Punitive Damages

Finally, Defendants request that this Court strike Plaintiff's prayer for punitive damages, in part because Defendants "undertook numerous good faith efforts to comply with anti-discrimination laws and maintain a workplace free of discrimination, harassment, and retaliation." (ECF No. 83-1 at 30). However, as the Court has denied summary judgment on all but one of Plaintiff's claims, it would be premature at this point to make a finding as to damages. *See Brown-Marshall v. Roche Diagnostics Corp.*, No. 10-5984, 2013 WL 3793622, at *7 (D.N.J. July 9, 2013) ("Because the issue of punitive damages is a fact-sensitive question for a jury, ruling on this issue at the summary judgment stage would be premature."). Accordingly, Defendants' request to strike Plaintiff's prayer for punitive damages is denied.

## IV.    CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment or, in the alternative, to strike Plaintiff's claim for punitive damages is hereby granted to the extent that it seeks judgment on Plaintiff's FMLA claim, but is denied to the extent that it seeks judgment on all other claims and to strike Plaintiff's claim for punitive damages.  An appropriate Order follows this Opinion.

Dated: February 14, 2019.

**JOSE L. LINARES**
Chief Judge, United States District Court